STATE of Missouri, Respondent,

v.

Wyman O'Neal POTTER, Appellant.

No. 10047.

Missouri Court of Appeals, Springfield District.

Nov. 13, 1975.

John C. Danforth, Atty. Gen., Sheila Hyatt, Asst. Atty. Gen., Jefferson City, for respondent.

James R. Reynolds, Ford, Ford, Crow & Reynolds, Kennett, for appellant.

Before BILLINGS, C. J., and STONE and TITUS, JJ.

TITUS, Judge.

A jury convicted defendant of second degree burglary (§ 560.045)[1] and stealing (§ 560.156), and fixed his punishment at two years' imprisonment for each offense. §§ 560.095(2) and 560.110, subd. 1. In pronouncing sentence, the court fixed the terms to run consecutively. § 560.110, subd. 2. Defendant has appealed.

Defendant says the evidence was not enough to sustain the conviction. Although defendant properly preserved this point for appellate review, we would, nevertheless, be bound to recognize it for if the evidence be insufficient to sustain the conviction, plain error affecting substantial rights is involved from which manifest injustice must have resulted. *State v. White*, 439 S.W.2d 752, 753[2] (Mo.1969); *State v. McClunie*, 438 S.W.2d 267, 268[2] (Mo.1969); *State v. Alderman*, 500 S.W.2d 35, 36[1] (Mo.App.1973); Rule 27.20(c).

1. References to statutes and rules are to RSMo 1969, V.A.M.S., and to Missouri Supreme Court Rules of Criminal Procedure, V.A.M.R.

To determine if the evidence was enough to sustain the conviction, we accept all as true which tends to prove defendant's guilt [*State v. Chase*, 444 S.W.2d 398, 401[1] (Mo. banc 1969)], and indulge all reasonable inferences favorable to the state [*State v. Davis*, 516 S.W.2d 784, 785[3] (Mo.App. 1974)], bearing in mind that in a cause such as this where the conviction depends upon circumstantial evidence, the circumstances must be consistent with each other, must tend to prove guilt, and not only must be consistent with the hypothesis of the guilt of the defendant, but must be inconsistent with every other reasonable hypothesis including the hypothesis of defendant's innocence. *State v. Cox*, 527 S.W. 448, 452[3] (Mo.App.1975); *State v. Eye*, 492 S.W.2d 166, 167–168[2] (Mo.App.1973); MAI–CR 3.42.

C. L. Watson resided 3½ miles southwest of Senath, Dunklin County, Missouri. At 7:45 p. m. September 11, 1974, he departed the house and returned at 9:15 p. m. to find his home had been forcibly entered and ransacked. The rear glass storm door was broken and the back door had been forced open. A safe, weighing 80 to 100 pounds and containing $800, was missing. Watson notified the authorities and they responded.

A deputy sheriff found "a large piece of jagged glass" on the back porch which had "what appeared to be blood" on it. There was no blood inside the house, but "the next morning . . . in the daylight" blood spots were discovered on the graveled driveway at the Watson home.

The next morning, or perhaps the night of the burglary (the record is not clear), tire marks were observed adjacent to the Watson driveway which indicated a U-turn had been made by a vehicle on which were mounted three "regular type tires" and one "mud and snow tire." In tracking the tire marks, they led to the Coldwater vicinity, some 6 miles southeast of Watson's home,[2]

before being lost when the vehicle traveled onto pavement. Someplace near the tire marks in the Coldwater area, a jewelry box (contents unknown) was discovered the day following the burglary. Watson had not missed the box prior to its discovery.

On the night of the burglary the authorities asked area hospitals to notify them should anyone appear for treatment of a laceration. Responding to a call from the Hayti Hospital (in Pemiscot County about 32 miles from the Watson residence), officers arrived at the hospital about 10:30 p. m. Defendant was in the emergency room with his right hand bandaged as part of the treatment given because of a laceration to the dorsal surface thereof. Outside in the hospital parking lot and waiting for defendant, were Loal Joiner and two lady companions. They were in a Buick automobile owned by Joiner's mother. The Buick was equipped with three regular tires and one mud and snow tire. Defendant gave his permission for a blood sample to be taken from him; Joiner gave the authorities permission to search the vehicle.

In a search of the automobile by several officers, some bloody newspapers were found in the rear seat and a punch was seen lying under the front seat. The newspapers were removed; the punch was not. Nothing was found inside the trunk of the car. The Buick was towed to a storage lot in Kennett. Defendant and Joiner were arrested; their women companions were not. When defendant was arrested he had 8 cents in his pockets. The amount of money, if any, possessed by Joiner or the two women at the time, was never revealed.

One Franklin McDaniel, who had disappeared from the area by trial time, found the stolen safe in Ditch 6 about 6 miles southwest of Hayti the afternoon of September 17. It had been opened. This discovery prompted another search of the Buick and this time, in the trunk, the offi-

---

2. We judicially notice the geographical location of cities in the state and the distances between them. *Walsh v. Table Rock As-* *phalt Construction Co.*, 522 S.W.2d 116, 118[2] (Mo.App.1975).

cers reported finding some "white material." The punch was also then removed from the car. About two weeks after the burglary, the officials delivered to a criminologist the blood sample taken from the defendant the night of the burglary, the bloody newspapers, bloody glass found at the Watson residence, the punch found in the car, the "white material" taken from the Buick's trunk, and a sample of insulation obtained from the safe. The criminologist, a state's witness, testified it was "highly probable" that the "white material" found in the car trunk and the sample taken from the safe had "a common origin," that they had "a plaster or gypsum like composition" and "a similar appearance" to "plaster that might come off a wall or concrete that might be on a sidewalk or on a street." Analysis of the blood items given the criminologist produced "a weak A-type." The expert stated the blood items had not been kept in the approved manner and the "possibility is that if in the case of an old reactor, I could have, due to a bacterial combination, received a weak A reaction with no [type] O reaction." It was stipulated that defendant's blood type was "O-Positive." "The stain material upon the punch turned out to be rust." No fingerprint analysis was undertaken and no effort was made to match the tire tread marks found at or near the scene of the burglary with the tread of the tires on the Buick belonging to Mrs. Joiner.

What did the foregoing evidence establish? (1) That at some unknown time between 7:45 and 9:15 p. m. September 11, 1974, a burglary and stealing occurred at the Watson residence; (2) that in gaining entry into the home, some person or persons received bleeding lacerations to some part of the body when the glass on the storm door was broken; (3) that an 80 to 100 pound safe containing $800 and a jewelry box with contents unknown was removed from the premises; (4) that at some unknown time before discovery, tire tracks were made at the Watson residence by some unseen vehicle equipped with three regular tires and one mud and snow tire which were traced to a community about 6 miles southeast of the Watson home; (5) that sometime before 10:30 p. m. September 11, defendant was riding in a Buick belonging to Mrs. Joiner, accompanied by Loal Joiner and two women, went to the Hayti Hospital and was treated for a laceration to the back of his right hand; (6) that the stolen safe was discovered in a ditch on September 17, some 30 miles from the Watson home; (7) that three regular tires and one snow tire were mounted on the Buick; (8) that although nothing (save the bloody newspapers and a punch) was found in searching the Buick on the date of the crime, that on the day the safe was found, there was found in the trunk of the car, some plaster or gypsum or plaster-like material that was highly probable to have had a common origin with the material used for insulating the safe; (9) that an analysis of the blood items made by the criminologist showed them to be a weak A-type; (10) that defendant's blood type was O-Positive; (11) that the stain material on the punch was rust; (12) that no fingerprint analysis was made and no effort was expended to match the Buick's tire treads with those found at and near the Watson residence.

More importantly what didn't the evidence establish? It did not establish this: (a) That the two crimes charged were committed at the same time during Watson's 1½ hour absence from his home; (b) that the person or persons who committed the burglary were one and the same person or persons who committed the stealing; (c) that the tire marks discovered at the Watson house were made when the crimes were committed; (d) that the tire marks were made by the Buick; (e) that the tire treads on the Buick matched or were similar to the tread marks discovered at and near the Watson property; (f) that even assuming the Buick made the marks, that the marks were made at the time the crimes were committed, or that defendant, who did not own the Buick, was in the car at anytime it may have been at the Watson house; (g)

that the blood discovered at the crime scene was defendant's blood; (h) that defendant's laceration was the result of a cut inflicted by glass; (i) that defendant cut his hand when the glass on the storm door was broken; (j) that defendant was ever at or near the Watson residence; (k) that either defendant or Joiner knew of the location of the Watson home before the time the crimes were committed or knew of the existence of the safe, the jewelry box or their contents; (*l*) that defendant or Joiner ever had the stolen items in their possession; (m) that defendant or Joiner or both put the safe in the ditch where it was discovered; (n) that the punch found in the Buick figured in any way with the crimes charged or in opening the safe; (*o*) that even assuming some of the stolen property may have been in the Buick, that defendant was in the Buick or aware of their presence therein at anytime.

We do not believe that the evidence relied on by the state is irreconcilable with the hypothesis of defendant's innocence. Should we concede for present purposes the evidence, which it was not, was sufficient to justify the inference that the Buick was employed in commission of the crimes or to haul away the safe from Watson's house, this is not enough. To directly connect defendant with the crime it is necessary to also infer that because he was later transported in the Buick to the Hayti Hospital he was present and participated in the burglary and larceny. This is not a permissible inference. *State v. Schrum*, 347 Mo. 1060, 1065, 152 S.W.2d 17, 19–20[3] (1941). The facts held insufficient to support a conviction in *State v. Morse*, 515 S.W.2d 608 (Mo.App.1974), in *State v. Eye*, supra, 492 S.W.2d 166, and in cases therein cited and considered, are more persuasive to support a conviction than the facts in this case. A verdict based on suspicion, surmise or conjecture, however strong, is insufficient to permit a criminal conviction, and that is all we have here. There being no substantial evidence of defendant's guilt,

we must reverse the conviction. Additionally, as it does not appear that upon another trial a submissible case might be made [*State v. Goodman*, 449 S.W.2d 656, 662[16] (Mo.1970)], the defendant is ordered discharged. Accordingly, the judgment is reversed and the defendant is ordered discharged.

All concur.